Felisha A. BRADLEY, Plaintiff,

v.

CARYDALE ENTERPRISES, The 7250 Partnership, Holly Court Operating Partnership, Carydale Apartments, Inc., Dale Weed, Paul C. Kincheloe, Jr., Betty Doss, Ann Hall, Defendants.

Civ. A. No. 88–1362–A.

United States District Court, E.D. Virginia, Alexandria Division.

July 24, 1989.

Victor Glasberg and Jonathan M. Smith, Alexandria, Va., for plaintiff.

Ira S. Saul, Saul & Barclay, P.C., Fairfax, Va., for defendants.

## MEMORANDUM OPINION

CACHERIS, District Judge.

This is a housing discrimination action brought by Felisha A. Bradley under the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982 (1982), the Virginia Fair Housing Law, Va.Code Ann. §§ 36–88(1)–(2) (Supp. 1988), and the Fairfax County Human Rights Ordinance, Fairfax County, Va., Code §§ 11–1–3(a)(1), (3), (4), (5) (1982). Bradley claims that the defendants—her landlord and its various owners and management personnel—discriminated against her on the basis of race when they allegedly ignored her racial harassment complaints and retaliated against her for filing discrimination complaints with various government agencies.[1]

For the reasons set forth below, Judgment is entered in favor of Bradley pursuant to 42 U.S.C. §§ 1981 and 1982, the Virginia Fair Housing Law, and the Fairfax County Human Rights Ordinance.

## I. FINDINGS OF FACT.

After review of the pleadings, evidence, authorities, and arguments of counsel, the court adopts the Stipulations of Parties and finds the facts as follows:

Felisha A. Bradley, the plaintiff, is black. She has been a tenant of the Holly Court Apartments on Jon Paul Drive in Alexandria, Virginia since 1976. (Stipulations ¶ 8, at 3). At the time of the incidents in this case she was employed as an accounting assistant in the accounts payable department of the National Solid Waste Management Association and as a senior accounts payable processor at the D.C. National Bank, which is now the Sovran Bank. (*See* Trans.Vol. I, Bradley at 3–4).

Carydale Enterprises ("Carydale") is a trade name for a group of businesses engaged in the ownership, management, and maintenance of nine apartment complexes in the Northern Virginia area, which consist of 796 rental units. (Stipulations ¶ 1, at 1). The Holly Court Apartments is one of the complexes owned and managed through Carydale, a defendant in this case.

Dale Weed, another defendant, is the Chairman of the Board of Carydale and has an ownership interest in each of the apartment complexes managed through Carydale. Weed and Paul C. Kincheloe, Jr., a defendant here, are the legal owners of the Holly Court Apartments. As co-trustees they hold legal title to the property for its beneficial owner, The 7250 Partnership, a defendant in this case. Weed is the sole general partner and Kincheloe is a principal limited partner of The 7250 Partnership. (Stipulations ¶¶ 1, 2, at 1–2).

Holly Courts Operating Partnership, a defendant, is the operating master lease holder for the Holly Court Apartments. It leases the property from its beneficial owner, The 7250 Partnership, and hires a management company for the property. At all times relevant to this suit, Carydale Apartments, Inc. was the management company hired by Holly Courts Operating Partnership to manage the Holly Court Apartments. The 7250 Partnership, Holly Courts Operating Partnership, and Carydale Apartments, Inc. own, operate, and manage the Holly Court Apartments under the name of Carydale Enterprises. Cary-

---

1. On March 20, 1989 this court entered a Consent Order pursuant to which Holly Court Apartments was dismissed as a defendant. On March 24, 1989 this court dismissed without prejudice the defendants' Third Party Complaint against Deborah Gill.

dale Enterprises is the named lessor in the lease executed by tenants of the Holly Court Apartments. (Stipulations ¶¶ 3, 4, 5, at 2–3).

At the time of the incidents in question, Carydale failed to adopt certain compliance measures to prevent racial discrimination. Carydale did not include Equal Housing Opportunity logos on its advertisements and did not place housing posters in its office. Carydale did not have a written discrimination policy. It was Carydale's policy, however, to investigate and resolve tenant disputes. In 1986 Carydale had approximately twenty management employees, none of whom were black. (Trans.Vol. II, Hall at 20, 38–40). The Holly Court Apartments include 109 units, and at the time in question, housed twenty-one blacks, one Hispanic, four Orientals, and eighty-three caucasians. (Trans.Vol. III, Doss at 91; Defendants' Exh. R).

Betty Doss, a defendant, has been a resident manager of the Holly Court Apartments since 1980. (Trans.Vol. III, Doss at 70). Ann Hall, also a defendant, is a property manager for Carydale and has managed the Holly Court Apartments since 1976. (Trans.Vol. II, Hall at 2–3).

Bradley occupies apartment 301 in the Holly Court Apartments. From March 1, 1985 to February 28, 1986 she had a one year lease. (Stipulations ¶ 8, at 3). Since March 1, 1986 Bradley has resided at the Holly Court Apartments as a month to month tenant. (Stipulations ¶ 9, at 4). Holly Court tenants must request a lease renewal and if they do not make such a request, they become month to month tenants. Bradley never requested a new lease. (Trans.Vol. III, Doss at 95–96).

On June 15, 1985 Deborah Gill and Kevin Turner, both of whom are white, leased apartment 201 in the Holly Court Apartments. Gill's apartment was directly below Bradley's apartment. The Holly Court Apartments are set up with a series of entranceways which include six apartments in each entranceway. (Trans.Vol. I, Bradley at 18; Trans.Vol. III, Doss at 71; Plaintiff's Exh. 2; Defendants' Exh. BB).

Bradley owned an Olympic component system which included a record player, eight track tapedeck, and two speakers. (Trans.Vol. I, Bradley at 69–70). From time to time Bradley would play loud music on her stereo which disturbed Gill and Turner. The loud music especially became a problem when Gill gave birth on September 2, 1985. The music would disturb the infant's sleep. (Trans.Vol. II, Gill at 177, 179–80; Trans.Vol. III, Turner at 25–26).

Michael and Lisa Struminger occupied apartment 102 in the Holly Court Apartments. They were also bothered by Bradley's loud music. (Trans.Vol. II, M. Struminger at 136–38, 143, L. Struminger at 168–69). When Michael Struminger and Gill complained to Bradley, Bradley stated that she had been a tenant at Holly Court for ten years and that she could do what she liked. (Trans.Vol. II, M. Struminger at 143, Gill at 179–80).

Gill complained to management as well as to the Fairfax County Police about the loud music. (Trans.Vol. II, Gill at 177, 179; Defendants' Exh. D). When Gill called Doss to complain about Bradley's loud music, Doss told Gill to "put it in writing" and advised Gill that she would have to hear the music first hand. (*See* Trans.Vol. III, Doss at 77, 105). Doss's usual response to a tenant who complained about another tenant over the phone was to tell the tenant to "put it in writing." (Trans.Vol. III, Doss at 80). On December 27, 1985 Gill and Turner wrote a letter to Carydale in which they complained that Bradley's excessively loud music had been a problem since June 15, 1985. (Defendants' Exh. B). In January, 1986, at approximately 10:30 p.m. or 11:00 p.m., Gill called Doss about the music. Doss went over to Bradley's apartment, heard the loud music, and asked Bradley to lower the volume. Bradley closed the door in her face. (Trans.Vol. III, Doss at 77–78).

Gill owned a German Shephard named L.B. (Trans.Vol. 11, Gill at 178). Gill and Turner testified that Bradley and her friends would knock on Gill and Turners' door in order to arouse Gill's dog, and that the barking would then disturb their baby.

(Trans.Vol. II, Gill at 196; Trans.Vol. III, Turner at 25–26). Bradley's friend, Garvia Hill, denied such conduct, (Trans.Vol. II, Hill at 131), and the court finds her testimony on this issue to be more credible than that of Gill and Turner.

In December, 1985 Bradley's cousin, Sandra Rutledge, visited Bradley at the Holly Court Apartments. Gill overheard Bradley tell Rutledge that Gill walked her dog without a leash. Gill then called Bradley and Rutledge "niggers." (Trans.Vol. I, Bradley at 7–8). Bradley called Doss about the incident with Gill, and Doss told Bradley to put her complaint in writing. (Trans.Vol. III, Doss at 75).

On January 4, 1986 Bradley wrote a letter to Doss in which she complained that Gill and Turner did not have a leash on their dog and that the dog came close to her before being called off. She also complained about "belligerent name calling." (Plaintiff's Exh. 4; Defendants' Exh. C). Following her receipt of the January 4, 1986 letter, Doss spoke to Gill about the unleashed dog. (Trans.Vol. III, Doss at 77, 104).

On January 24, 1986 Bradley wrote another letter to Doss in which she complained that Gill knocked on her door on January 22, 1986 and that they had a verbal confrontation at that time. Bradley stated that she called the police, who suggested that she swear out a civil warrant. However, since there was no physical confrontation, a civil warrant could not be issued. The letter did not mention name calling. (Trans.Vol. I, Bradley at 18, 19–20; Plaintiff's Exh. 7).

On February 13, 1986 Bradley wrote a letter to Doss in which she complained that Gill called her a "nigger" on February 6, 1989. (Plaintiff's Exh. 8). After she received the letter, Doss spoke to Hall about the problem. Hall said that they should offer to move Turner and Gill to a two bedroom apartment or they should offer to let Turner and Gill out of their lease without any penalty. Doss made the offer to Gill, but Gill said that she did not have the money to make the move. Gill also denied calling Bradley a "nigger." (Trans.Vol. III, Doss at 80–81).

Bradley was aware in 1986 that Doss offered to move Gill. (Trans.Vol. III, Bradley at 214–16). Doss did not ask Bradley to move and Bradley did not consider moving. (Trans.Vol. I, Bradley at 80–81).

On April 24, 1986 Bradley was leaving her apartment with Hill, when Gill came out of her apartment and called both of them "niggers" and "black asses." (Trans. Vol. II, Hill at 114).

On April 26, 1986 Bradley tried to move a couch into her apartment. The couch was too big to fit through her door. Bradley had some friends on her third floor balcony with a rope and had some other friends on the first floor. That evening, they tried to lift the couch up to the third floor balcony. (Trans.Vol. I, Bradley at 35–40, 96, 98).

On May 14, 1986 Gill again verbally abused Bradley with racial epithets. (Trans.Vol. I, Bradley at 41). On May 17, 1986 Hill arrived to pick up Bradley and was confronted by Gill who told her "look 'nigger[,]' you know you don't belong around here." (Trans.Vol. II, Hill at 120). On that same day Gill called the police to report that Bradley's boyfriend had attempted to climb over her balcony to assault her. Officer Michael Murn of the Fairfax County Police Department had been at the Holly Court Apartments investigating a robbery complaint when he received a second call regarding the alleged assault incident. He witnessed no such incident and he advised that Gill should seek psychiatric help. (Trans.Vol. III, Murn at 273–77).

On May 19, 1986 a confrontation occurred between Gill and Bradley and her black friends. Bradley's friends drove to the Holly Court Apartments to pick her up. When Bradley's friends arrived, Gill stepped onto her balcony and hollered "nigger." She then came down to the parking lot, put her hand inside the driver's window in the car in which Bradley and her friends were seated, and pointed her finger at Hill. Doss arrived on the scene and observed the altercation. At one point Bradley hit Gill with an umbrella. (Trans.Vol. I, Bradley at

46–50). During several of the confrontations, particularly during one of the incidents in May, Turner had to physically restrain Gill to prevent an assault. (Trans. Vol. III, Turner at 40).

At trial, Gill admitted to calling Bradley a "nigger" on numerous occasions. (Trans. Vol. II, Gill at 184, 229–30). She denied having a general bias against blacks, but indicated that she called Bradley a "nigger" because, in Gill's words, "she is one." (Trans.Vol. III, Gill at 17). Gill also testified that Bradley called her a "white bitch." (Trans.Vol. II, Gill at 185).

Carydale caused a five day pay or quit notice to be served upon Turner on April 7, 1986 and upon Turner and Gill on May 6, 1986 for Turner and Gills' failure to pay rent and gas bills. (Stipulations ¶¶ 11, 13, at 4; Defendants' Exhs. CC, DD). Holly Courts Operating Partnership served a summons for unlawful detainer returnable May 16, 1986 against Turner to recover possession of apartment 201 for failure to pay rent in the amount of $809.85. (Plaintiff's Exh. 15). Charles Sullivan, counsel for Gill at that time, called Kincheloe to tell him that the eviction notice did not name all of the proper parties. The summons was then dismissed because it did not name Gill as a defendant. (Defendants' Exh. I; Trans.Vol. III, Kincheloe, at 226, 227). Holly Courts Operating Partnership subsequently served a summons for unlawful detainer returnable June 13, 1986 which named Turner and Gill as defendants for failure to pay rent in the amount of $628.68. (Plaintiff's Exh. 21).

Gill and Turner left the apartment complex in June, 1986 and the parties were unable to find them until the week before trial. The defendants covered Gill and Turners' expenses which they incurred to attend the trial. (Trans.Vol. II, Gill at 207; *see* Trans.Vol. III, Kincheloe at 244).

Carydale caused a thirty day notice to vacate premises, dated May 9, 1986, to be served upon Bradley on May 22, 1986.

(Plaintiff's Exh. 14). At trial, Hall admitted that when Bradley asked her why Carydale served the notice, Hall refused to give her any explanation. Hall testified that the couch incident triggered her decision to issue the notice to vacate and that Bradley's loud music also influenced her decision. (Trans.Vol. II, Hall at 4; Trans.Vol. III, Hall at 174). It was Carydale's policy that Doss would not make any eviction decisions. Hall, the property manager, made such decisions. (Trans.Vol. III, Doss at 112).

Weed was not involved in making the decision to send the May notice to Bradley. In 1984 Weed retired from active involvement in Carydale. Prior to May, 1986, when he came out of retirement, Weed did not assume any of the day-to-day property management responsibilities. Weed became active and got involved in this case only after the notice to Bradley was sent in May. (Trans.Vol. II, Hall at 30–36).

After she received the notice to vacate, Bradley filed discrimination complaints with the NAACP, the Fairfax County Department of Consumer Affairs, the Fairfax County Human Rights Commission, the Virginia Department of Commerce, and the United States Department of Housing and Urban Development. (Trans.Vol. I, Bradley at 54–57; Plaintiff's Exhs. 16, 17, 18, 19, 20). When these entities intervened, Carydale halted its attempt to evict Bradley. (Trans.Vol. II, Weed at 92–93).

During the summer of 1986 the Fairfax County Human Rights Commission ("Commission") and the Virginia Real Estate Board ("Board") investigated the incidents. On July 2, 1986 the Commission held a fact finding conference.[2] Warren Bailey was the investigator assigned to the case, and he made his report to Fred Allen, who is the Commission's Executive Director. (Trans.Vol. I, Allen at 105, 113, W. Bailey at 155, 176). On November 26, 1986 the Board, through the Virginia Department of

---

**2.** The court listened to the fact finding conference tape. The court heard the testimony of Bradley, Weed, and Doss and understands Kincheloe's allegation that the hearing was not conducted fairly. At one point, Bailey accused

Doss of lying. (Plaintiff's Exh. 26, Tape of Fact Finding Conference; *see* Plaintiff's Exh. 58 at 109). The court considers the objections to the tape's admission as going to the weight of the evidence.

Commerce, advised Mr. Kincheloe that the attempted eviction of Bradley was prompted by racial factors.[3] (Plaintiff's Exh. 34 at 4).

While the matters were pending before the Commission and the Board, the defendants caused a second notice to vacate, dated October 27, 1986, to be served on Bradley. Weed was hoping that as a result of the second notice the Commission would dismiss the case. (Trans.Vol. II, Weed at 93; Plaintiff's Exh. 33). Kincheloe concurred in Weed's decision to send the second notice in order to bring the matter to a conclusion. (Trans.Vol. III, Kincheloe at 239–40, 245). Both Kincheloe and Weed testified that the reason for serving the second notice of eviction was to bring matters to a conclusion. They argued that the first notice of eviction was held in abeyance while negotiations were held with the Commission and the Board, and that the second notice was merely a renewal of the original notice. (Trans.Vol. III, Kincheloe at 240; see Trans.Vol. II, Weed at 92). At trial, Weed testified that he did not know whether the word "nigger" was disrespectful to blacks. (Trans.Vol. II, Weed at 94–96).

After the defendants issued the first notice to vacate Bradley maintained a good tenancy record. Weed and Kincheloe testified that the defendants were not having any problems with Bradley when the second notice was served and that nothing happened in the interim period from June through October, 1986 to cause a second notice to vacate to be sent to Bradley. (Trans.Vol. II, Weed at 94; Trans.Vol. III, Kincheloe at 246–48). Bradley did issue two bad checks on May 5, 1988 and February 4, 1989 which she promptly covered after notification. (Trans.Vol. II, Hall at 22–23; Defendants' Exhs. Y & Z).

On November 26, 1986 the Board issued a letter in which it found that Carydale violated the Virginia Fair Housing Law. (Plaintiff's Exh. 34). On December 31, 1986 the Commission issued a letter in which it concluded that there was sufficient evidence to support Bradley's discrimination claims under the Fairfax County Human Rights Ordinance. (Plaintiff's Exh. 35). On May 4, 1988 the Commission held a public hearing. On June 17, 1988 the Commission issued a letter to Weed which advised that the Commission had found probable cause to believe that Carydale violated the Fairfax County Human Rights Ordinance. (Plaintiff's Exh. 41). The Commission referred the matter to the County Attorney's Office for enforcement. The County Board of Supervisors declined to take any action and offered no reasons for the decision. (Stipulations ¶ 3, at 7–8; Trans.Vol. I, Allen at 127, 147–48).

On two previous occasions the defendants were faced with problems between tenants. On one occasion two white tenants could not get along and both were evicted. On another occasion a white woman complained about a black man who lived a floor above her. She complained about his walking which made the floors creak. The defendants moved the white tenant upstairs and both tenants were happy with the results of the move. (Trans.Vol. II, Hall at 7–10; Trans.Vol. III, Doss at 93, Hall at 200).

Carydale issued thirty day notices to vacate to tenants in at least thirty-five other cases. (Trans.Vol. II, Hall at 71–72). In some instances, however, Carydale issued 21–30 day notices to deal with problems of noise, the failure to wear shoes and a shirt, sanitation, and a dog left on a patio. A 21–30 day notice gives the tenant twenty-one days to remedy a breach of the tenant's lease. A tenant who fails to relieve the problem must vacate the apartment within thirty days. (Trans.Vol. II, Hall at 52, 56, 66–67, 69). Hall testified that she did not issue 21–30 day notices in this case because she was "hoping for a faster solution than a 21–30 day letter." (Trans.Vol. III, Hall at 168).

---

**3.** In accordance with *Chandler v. Roudebush,* 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976), the court admitted as evidence, the findings of the Commission and the Board. *See id.* at 863 n. 39, 96 S.Ct. at 1961 n. 39. The court agrees with Judge Ellis, however, that the findings are not entitled to *res judicata* effect in this action. *Bradley v. Carydale Enter.,* 710 F.Supp. 1063, 1063 (E.D.Va.1989).

## II. CONCLUSIONS OF LAW.

Bradley relies on several theories of liability to support a judgment in her favor. She alleges that the defendants violated 42 U.S.C. §§ 1981 and 1982, and sections of the Virginia Fair Housing Law and the Fairfax County Human Rights Ordinance. Prior to trial, the defendants filed a motion to dismiss this case on the grounds that the action here is merely a dispute between tenants for which a landlord is not responsible.[4] The Honorable T.S. Ellis, III denied the defendants' motion. He recognized that Bradley's case is based on the defendants' failure to investigate and resolve her racial harassment complaints in the same manner in which the defendants resolve other complaints, and that Bradley does not seek to recover on the basis of Gill's racism, alone.[5] *See Bradley v. Carydale Enter.*, 707 F.Supp. 217, 223, 224, 225 (E.D. Va.1989) (discrimination claim for failure to resolve racial harassment complaints and not for neighbor's racism). Bradley also alleges that the defendants retaliated against her for filing discrimination complaints with various federal, state, and local agencies. This court agrees with Judge Ellis that Bradley has stated claims for which relief can be granted, if proven.

### A. *42 U.S.C. §§ 1981 and 1982.*

Bradley claims that the defendants violated her right to make and enforce contracts on an equal basis regardless of race, to lease property on an equal basis regardless of race, and to obtain nondiscriminatory terms and conditions of rental housing guaranteed by 42 U.S.C. §§ 1981 and 1982. Bradley contends that the defendants violated her rights under §§ 1981 and 1982

when they: (1) refused to enforce a provision of Bradley's lease which bars tenants from engaging in "objectionable conduct" and failed to investigate and resolve her complaints about a tenant in the same manner as they investigated and resolved white tenants' complaints; and (2) attempted to evict her—retaliated against her—in response to her racial harassment complaints.

Section 1981 provides that "[a]ll persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens...." After conclusion of the trial in this case, the Supreme Court rendered an opinion in which it narrowed the scope of § 1981 to exclude certain racial discrimination claims which do not relate to the making or enforcement of contracts. In *Patterson v. McLean Credit Union*, — U.S. —, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court held that "racial harassment relating to the conditions of employment is not actionable under § 1981 because that provision does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." *Id.* at —, 109 S.Ct. at 2369. The Court explained that § 1981 does not cover a defendant's breach of the contract terms or imposition of discriminatory employment conditions, but does protect the right of access to the legal process. The Court pointed out that § 1981 prohibits "wholly *private* efforts to impede access to the courts or obstruct nonjudicial methods of adjudicating disputes about the force of binding obligations, as well as discrimination by private entities, such as labor unions, in en-

---

**4.** The defendants also relied on a statute of limitations defense. The court is satisfied that Bradley's receipt of the second notice to vacate overcomes the defense. *See Bradley v. Carydale Enter.*, 707 F.Supp. 217, 220 (E.D.Va.1989) (limitations period began when Bradley received second notice).

**5.** Counsel stated in oral argument that they have been unable to find a case similar to this suit. The Supreme Court recently dealt with third party liability in *DeShaney v. Winnebago County Dep't of Social Services*, — U.S. —, 109 S.Ct.

998, 103 L.Ed.2d 249 (1989). *DeShaney*, a 42 U.S.C. § 1983 case, is not dispositive here. In this case, unlike in *DeShaney*, the plaintiff alleges racial discrimination. In a footnote, the Supreme Court acknowledged that the defendants could not selectively deny protection to the plaintiff. *See id.* 109 S.Ct. at 1004 n. 3. This is also not a situation in which the defendants acquiesced in or approved of. Gill's behavior. *Cf. Katz v. Dole*, 709 F.2d 251, 256 (4th Cir. 1983) (employer's supervisory personnel acquiesced in or approved of employee's behavior).

forcing the terms of a contract." *Id.* at ——, 109 S.Ct. at 2373.[6]

■ *Patterson,* in effect, prohibits the application § 1981 to Bradley's discrimination claim because the claim relates to the conditions of her tenancy and not to the formation of her lease. *Patterson,* however, does permit the application of § 1981 to Bradley's retaliation claim because that claim goes to the defendants' interference with Bradley's right to enforce her lease obligations through legal process.[7] *Accord Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir.1989) (§ 1981 applied to retaliatory discharge claim).

■ Bradley's discrimination claim survives the *Patterson* case because the claim is actionable under § 1982. Her retaliation claim is also covered by § 1982. Section 1982 provides that "[a]ll citizens ... shall have the same right ... as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." Section 1982 is broad in scope. Prohibited activity under § 1982 includes, but is not limited to, the refusal to rent or sell property. The property rights protected under § 1982 are those included in the "bundle of rights for which an individual pays" when he or she leases a piece of property. *Tillman v.*

*Wheaton–Haven Recreation Ass'n,* 410 U.S. 431, 437, 93 S.Ct. 1090, 1093, 35 L.Ed.2d 403 (1973); *accord Wright v. Salisbury Club, Ltd.,* 632 F.2d 309, 314 (4th Cir.1980). The statute may be violated when a party restricts a tenant's use of his or her property. *City of Memphis v. Greene,* 451 U.S. 100, 120, 101 S.Ct. 1584, 1596, 67 L.Ed.2d 769 (1981); *see Concerned Tenants Ass'n v. Indian Trails Apartments,* 496 F.Supp. 522, 524, 527 (N.D.Ill. 1980) (§ 1982 applies to abandonment of services previously provided to white tenants but later denied to black tenants).

Bradley's discrimination claim may be classified as a claim for restricted use of property. Such a claim is actionable under § 1982. Bradley's retaliation claim also relates to use restriction and is covered by § 1982. *See Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 235, 237, 90 S.Ct. 400, 403, 404, 24 L.Ed.2d 386 (1969) (claim under § 1982 based on protest against discrimination made to private housing board); *Williams,* 871 F.2d at 457 (retaliation claim under § 1981).

### 1. *Discriminatory investigation and resolution of complaints.*

In *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67

---

**6.** In *Patterson,* the Supreme Court also declined to overrule *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), in which the Court held that § 1981 covers private contracts. *See Patterson,* —— U.S. at —— – ——, 109 S.Ct. at 2369–70.

**7.** Judge Ellis distinguished *Patterson* based on the Fourth Circuit opinion in the case. *See Bradley,* 707 F.Supp. at 223–24. As previously mentioned, *Patterson* was still pending before the High Court when Bradley's case was before Judge Ellis. The Supreme Court's language is far broader than that of the Fourth Circuit and renders *Patterson* applicable to this case.

Judge Ellis distinguished *Patterson* by comparing Bradley's claims to the plaintiff's promotion and discharge claims which the Fourth Circuit upheld in *Patterson.* Judge Ellis pointed out that the Fourth Circuit permitted the plaintiff's claims for discriminatory failure to promote and discharge to stand because " '[c]laims of racially discriminatory hiring, firing, and promotion go to the very existence and nature of the employment contract and thus fall easily within § 1981's protection.' " *Id.* at 223 (quot-

ing *Patterson v. McLean Credit Union,* 805 F.2d 1143, 1145 (4th Cir.1986)). Judge Ellis reasoned that Bradley's claims, like the promotion and discharge claims in *Patterson,* refer to her contract. *Bradley,* 707 F.Supp. at 224. The Supreme Court, however, did not follow the Fourth Circuit's rationale. The Court stated that in some situations a promotion claim is not actionable under § 1981. Under *Patterson,* a promotion claim is actionable under § 1981 only when "the nature of the change in position was such that it involved the opportunity to enter into a *new* contract with the employer." *Patterson,* —— U.S. at ——, 109 S.Ct. at 2377. (emphasis added). In other words, the Supreme Court concluded that a promotion claim which concerns the terms of an old contract is not actionable under § 1981. Similarly, Bradley's claim which concerns the terms of her existing lease and does not address the execution of a new lease is not actionable under § 1981. The Supreme Court's discussion of promotion claims and its statement that claims for breach of contract terms are not actionable under § 1981, demonstrate that *Patterson* does limit Bradley's discrimination claim.

L.Ed.2d 207 (1981) and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court set forth the burden of proof framework required for Title VII actions under a disparate treatment claim. *See Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94; *McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. at 1824–25. This framework also governs §§ 1981 and 1982 liability. *See, e.g., Williams*, 871 F.2d at 457 (§ 1981 claim); *Selden Apartments v. United States Dep't of Housing & Urban Dev.*, 785 F.2d 152, 159 (6th Cir.1986) (§§ 1981 and 1982 claims).

The Supreme Court rendered another opinion after conclusion of the trial in this case, *Price Waterhouse v. Hopkins*, — U.S. —, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), which modifies the burden of proof framework set forth in *Burdine* and in *McDonnell Douglas*. The modified framework, however, is not applicable to all situations. The modified framework is to be applied only in a "mixed motive" case and not in a "pretext" case. *Price Waterhouse*, 109 S.Ct. at 1788–89 & n. 12.

■ A "mixed motive" case is one in which a plaintiff demonstrates "that it is more likely than not that a forbidden characteristic played a part in the employment decision...." *Id.* at 1789 n. 12. When the plaintiff makes such a demonstration the defendant must respond by establishing, by a preponderance of the evidence, that it also made its decision based on some legitimate nondiscriminatory criteria. *Id.* at 1788, 1792, 1793. In a "pretext" case such as *Burdine*, the plaintiff must first set forth a prima facie case of discrimination. The burden of persuasion never shifts to the defendant. *Id.* 109 S.Ct. at 1788. If the defendant sets forth some legitimate nondiscriminatory reason for its conduct the plaintiff must then establish that the

reason is merely a pretext for its discriminatory action. *Burdine*, 450 U.S. at 255–56, 101 S.Ct. at 1094–95.

■ Bradley's claim of failure to investigate and resolve complaints should be analyzed as a pretext case. Bradley set forth no direct evidence of intent to discriminate with regard to such a claim. There was evidence of the defendants' efforts to investigate Bradley's, Gill's, and other tenants' complaints. This evidence, at most, would demonstrate pretext and would not rise to the level of proof required in a mixed motive case.

■ To establish a prima facie case under § 1982 for the failure to investigate and resolve discrimination complaints, Bradley must establish that:

(1) she is a member of a racial minority;

(2) she was denied rights and benefits which are connected with the leasing of property.

(3) the same services and rights were enforced when racial allegations were not involved.

*Cf. McDonnell Douglas*, 411 U.S. at 802 & n. 13, 93 S.Ct. at 1824 n. 13 (prima facie elements in Title VII claim); *Shaw v. Cassar*, 558 F.Supp. 303, 312 (E.D.Mich.1983) (prima facie elements of § 1982 discriminatory eviction claim).[8]

Bradley contends that the defendants discriminated against her in their efforts to stop Gill's harassment and in their decision in May to send her a thirty day notice rather than a 21–30 day notice. Bradley has satisfied the first element of the prima facie case: She is black. She has not established the second and third elements with regard to the defendants' efforts to stop Gill's harassment, but she has satisfied the second and third elements with respect to the decision to send her a thirty day notice.

---

**8.** In *McDonnell Douglas*, the Supreme Court recognized that because facts vary among Title VII cases, prima facie elements will also vary from case to case. *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. It follows that for § 1982 cases, the prima facie elements will differ in each case. Some courts have required a showing that the owner refused to rent the

property to the plaintiff. *See, e.g., Sandford v. R.L. Coleman Realty Co.*, 573 F.2d 173, 175 (4th Cir.1978); *Selden*, 785 F.2d at 159. The prima facie case here need not include such an element. *See Shaw*, 558 F.Supp. at 312 (prima facie case for discriminatory eviction claim did not include showing of refusal to rent).

Bradley had a right to have the defendants deal with her complaints against Gill. Hall testified that it is Carydale's policy to investigate and resolve tenant disputes. Carydale's policy constitutes a right connected with Bradley's tenancy. The defendants did investigate and attempt to resolve Bradley's problems with Gill in a manner similar to their treatment of complaints which did not involve allegations of racial harassment.

Gill's shocking behavior warranted the defendants' attention. To clear the decks and put this case in the proper perspective, the court finds that Gill is a racist. Gill's own testimony at trial and one Holly Court tenant's characterization of Gill as a low life slob (Plaintiff's Exh. 26, Tape of Fact Finding Conference, Testimony of Beverly Page), more than support such a conclusion. The court has difficulty believing any of Gill's testimony concerning the incidents, except her testimony with regard to Bradley's occasional loud music and her testimony that in response to being called a "nigger," Bradley called her a "white bitch." Gill's testimony with regard to the music is corroborated by Turner and Doss, and more importantly, by the Strumingers. Bradley, on occasion, played her stereo too loud, which disturbed other tenants. Her insensitive behavior, however, should not have provoked and does not excuse Gill's actions. Gill went out of her way to hurl the invective "nigger" at Bradley and Bradley's visitors. The defendants had some responsibility to deal with Gill.

The defendants dealt with Gill's and Bradley's complaints in a satisfactory manner. When Doss received phone calls from Gill and Bradley in which they complained about each other, Doss told both of them to put their complaints in writing. When Gill called Doss late one evening to complain about Bradley's loud music, Doss went over to Bradley's apartment, heard the loud music, and asked Bradley to turn it down. After Doss received Bradley's January 4, 1986 letter Doss spoke to Gill about her unleashed dog. As soon as Doss was aware that Gill used the invective "nigger," she acted on Bradley's complaints. The court believes that the first time Doss was

aware that Gill called Bradley a "nigger" was when she read Bradley's February 13, 1986 letter. Prior to February 13 Bradley did advise Doss that Gill engaged in name calling. But Bradley's prior letters did not mention the term "nigger" and the court does not believe Bradley's testimony that she told Doss in late December and in early January that the term "nigger" was used. (*See* Trans.Vol. III, Bradley at 269–71).

The defendants handled Bradley's complaints about Gill's behavior in a manner similar to other complaints which did not involve discrimination. On at least two previous occasions the defendants were faced with problems between tenants. The problems were solved through a move or eviction. On other occasions Carydale issued thirty day notices and 21–30 day notices for such problems as unauthorized noise and for failure to wear shoes. Gill breached her lease when she hurled racial epithets toward Bradley at every possible opportunity. (Trans.Vol. II, Hall at 13; Plaintiff's Exh. 1, Lease Agreement ¶ 17 (reasonable observance of rights and welfare of other tenants)). Doss offered to move Gill and Turner, but they did not accept the offer. The defendants decided to issue a five day pay or quit notice and a summons for unlawful detainer to Gill and Turner which, in effect, forced Gill and Turner out of their apartment.

The defendants are at fault for their failure to implement certain fair housing compliance measures. The court finds, however, that their failure to adopt such measures is inconclusive here. The defendants relied on Doss's observations of discrimination and on her reports to Hall who made the eviction decisions. The court also finds that Carydale's lack of blacks among its management employees in 1986 is not determinative.

Kincheloe's and Weed's reasons for the October, 1986 notice to Bradley and Weed's attitudes toward blacks are probative of their intent to retaliate against Bradley for her discrimination complaints, but are not conclusive with regard to Bradley's discrimination claim. Kincheloe and Weed did not make the decision to issue the May

notice. Doss and Hall had the primary responsibility for the investigation and resolution of Bradley's and Gill's complaints. The court does not believe that Doss and Hall are racists or that they acted in a racist manner in handling the matters before them. They made a reasonable effort to deal with Bradley's complaints, for which the defendants should not be held liable.

The defendants might have acted sooner to stop Gill's harassment. A landlord, however, is not the keeper of its tenants. In a situation like this with a number of apartments under their supervision, the defendants could not reasonably have foreseen that one tenant would call another a racial epithet. The defendants were unaware, until February 13, 1986, of the nature of Gill's intolerant behavior. The defendants made reasonable attempts to ameliorate the problems between Gill and Bradley. The defendants did not create the hostile environment. It was created by a third party, Gill. The defendants had a responsibility to investigate and attempt to resolve the dispute as they investigated and attempted to resolve other matters. The defendants did take sufficient steps to deal with Gill's actions.

Bradley failed to establish the second and third elements of the prima facie case, with regard to the manner in which the defendants dealt with Gill. The court, therefore, need not address the question of whether the defendants had some legitimate nondiscriminatory reason for their investigation methods and whether such a reason was mere pretext.[9]

■ Bradley did establish a prima facie case with respect to the method by which the defendants first attempted to evict her. The May notice to vacate which the defendants sent to Bradley was reasonable in light of Bradley's actions in breach of her lease. Bradley breached her lease when she played her music too loud and when she attempted to move her couch over her balcony at night. (Plaintiff's Exh. 1, Lease Agreement ¶ 5 (no use of apartment for disorderly purpose or in manner offensive to occupants of other apartments), ¶ 17 (disturbing noise and objectionable music prohibited), Apartment Rules and Regulations ¶ 3 (apartment occupants shall not interfere with rights of other lessee), ¶ 12 (hours for moving furniture are 8:00 a.m. to 4:30 p.m.)). The defendants, however, could have taken less drastic measures than they did to deal with Bradley. The defendants did not send her a 21–30 day notice even though they sent other tenants such a notice. Bradley, like some tenants, received the more harsh, thirty day notice.

The defendants set forth a legitimate, nondiscriminatory reason for their decision to send the thirty day notice rather than a 21–30 day notice. Hall pointed out that a thirty day notice is generally more effective than the 21–30 day notice. Bradley did not prove that such a reason is pretext. Bradley failed to establish, by a preponderance of the evidence, that the defendants, in violation of § 1982, discriminated against her in their investigation and resolution of the problems between her and Gill.

### 2. *Retaliatory eviction.*

■ The burden of proof framework for Bradley's retaliation claim is similar to the framework applicable to her discrimination claim. *See Williams*, 871 F.2d at 457. Bradley's retaliation claim should be analyzed, however, as a mixed motive case. Bradley presented direct evidence of retaliation: testimony from Kincheloe and Weed that the second notice to vacate was issued to bring Bradley's discrimination complaints to a conclusion. The defendants, therefore, must persuade the court that they also relied on some legitimate nondiscriminatory reason for their decision to issue the second notice.

---

**9.** Had Bradley established a prima facie case, the defendants would still prevail. Bradley was not able to discredit the defendants' nondiscriminatory reasons for the delay in Gill's eviction. The defendants did not know of Gill's racial remarks until the middle of February. They thought that the best way to proceed was to encourage Gill and Turner to move and then to evict them based on nonpayment of rent rather than for nonmonetary breaches. Bradley did not prove that these reasons were pretext.

To prevail on her mixed motive retaliation claim under §§ 1981 and 1982, Bradley must prove that the defendants took adverse action against her in retaliation for her protected activity. *Cf. id.* (sets forth prima facie case for § 1981 retaliation claim).[10] Bradley has established such retaliation. Bradley engaged in protected activity: the filing of discrimination complaints with the NAACP, the Fairfax County Department of Consumer Affairs, the Fairfax County Human Rights Commission, the Virginia Department of Commerce, and the United States Department of Housing and Urban Development. The defendants took adverse action against her when they issued a second notice to vacate. The defendants had halted the eviction proceedings when the government agencies intervened. But they issued the second notice when the administrative proceedings were at an impasse.

Kincheloe and Weed admitted that they attempted to evict Bradley in an effort to bring her to the bargaining table. Kincheloe intended to thwart Bradley's efforts to put an end to any discrimination against her. Kincheloe, in effect, testified that he agreed with the decision to send the second notice to vacate because the notice would cause Bradley to drop her discrimination charges. He gave the following testimony:

> ... [I]t was my opinion that what had precipitated the initial filing of the complaint had been the initial 30–day letter. And we had agreed to hold that in abeyance. We were not reaching a resolution.
>
> It was my opinion ... that since we were not reaching a solution, we may as well go forward with the decision that we had made initially, and that will bring it to a conclusion, one way or another.

(Trans.Vol. III, Kincheloe at 245). Kincheloe later offered the following explanation for his agreement to issue the second no-

tice instead of canceling the notice to vacate: "I don't know that that would have resolved the complaint, because [Bradley] had filed a complaint and she sought certain things from us in addition to just being able to stay there on the premises. So I don't know that just dropping the matter would have resolved the complaint." (*Id.* at 248). Kincheloe's endorsement of and explanation for Weed's efforts to frustrate Bradley's legal endeavors is direct evidence of retaliation.

Weed's racist views, his personal involvement in Bradley's case, and his reasons for his decision to send the second notice to Bradley are also evidence of retaliation. At the fact finding conference Weed testified that he did not know whether the word "nigger" was disrespectful to blacks. Weed's comment is, at best, insensitive. Weed retired in 1984 from active participation in Carydale, but came out of retirement, so to speak, to take care of Bradley's case. He did not become involved in the day-to-day activities of property management until May, 1986—after the eviction notices in this case were sent to Gill, Turner, and Bradley. The court interprets Weed's actions as some indication of his intent to retaliate against Bradley for her efforts to resolve her problems through legal process.

Weed offered the same reason as Kincheloe for his decision to send a second notice to Bradley. Weed testified that he had hoped that as a result of the second notice, the Commission would have dismissed Bradley's complaint. It is apparent from Weed's testimony that Weed issued the second notice in order to halt the administrative proceedings against Carydale.

The defendants' nondiscriminatory reason for issuing the second notice is unpersuasive. The defendants testified that the second notice was not issued in retaliation for Bradley's complaints, but was issued

---

10. In a pretext case, the prima facie case for a § 1981 claim of retaliation includes three requirements:
    (1) that the plaintiff engaged in protected activity;
    (2) that the defendant took adverse action against the plaintiff; and

(3) that a causal connection existed between the plaintiff's protected activity and the defendant's adverse actions.
*Williams,* 871 F.2d at 457.

for the same reasons that the first notice was issued—that Bradley was in breach of her lease. The defendants stated that the second notice was not a new notice, but was merely a resumption of the first notice which they held in abeyance pending the outcome of Bradley's complaints with the government agencies.

It is hard to believe that the defendants issued the second notice for the same reasons as they issued the first notice. The defendants admitted that Bradley had done nothing in the period between the May and October notices to cause the defendants to issue a second notice. She no longer played loud music or otherwise breached her lease. Bradley did issue two bad checks, but the checks, issued in 1988 and 1989, could not have been the basis for the second notice. The court concludes that the reason the defendants issued the second notice to vacate was to force Bradley to resolve her complaints against Carydale.[11] The court further concludes that Bradley's continuing tenancy at the Holly Court Apartments may mitigate her damages but does not absolve the defendants of liability for their retaliation against Bradley in violation of §§ 1981 and 1982.

Carydale Enterprises, The 7250 Partnership, Holly Court Operating Partnership, Carydale Apartments, Inc., Dale Weed, and Paul C. Kincheloe violated §§ 1981 and 1982 when they retaliated against Bradley for her protected activity. Doss and Hall, however, were not involved in the retaliation efforts and may not be held liable for the other defendants' actions.

### B. *Virginia Fair Housing Law.*

■ Bradley contends that the defendants' discriminatory treatment violated § 36–88(1)–(2) of the Virginia Fair Housing Law. The Board found "reasonable cause to believe" that Carydale's "application of management policies" violated § 36–88(1)–(2). (Plaintiff's Exh. 34 at 4). Judge Ellis also held that Bradley's claims fall within § 36–88(1)–(2). *Bradley*, 707

F.Supp. at 224. This court agrees with the Board and Judge Ellis that Bradley's claims are actionable under § 36–88(1)–(2).

Section 36–88 states, in part, that

[i]t shall be unlawful discriminatory housing practice, because of race ... for any person having the right to sell, rent, lease, control, construct, or manage any dwelling ... or any agent, independent contractor or employee of such person:

(1) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling.

(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith.

Va.Code Ann. § 36–88. A landlord's attempt to evict a tenant—to make the apartment unavailable to the tenant—is actionable under § 36–88(1). The investigation of complaints is a service connected with apartment rental under § 36–88(2). Bradley's claims, therefore, fall within the scope of § 36–88(1)–(2).

Judge Ellis correctly noted that *Hudler v. Cole*, 236 Va. 389, 374 S.E.2d 39 (1988), does not bar the application of the Virginia Fair Housing Law to this case. *Bradley*, 707 F.Supp. at 224 n. 17. In *Hudler*, the Virginia Supreme Court held that § 36–88 does not regulate a landlord's restriction of the sale or rental of property by an existing tenant, but does regulate a landlord's restriction of the sale or rental of property to a prospective tenant. *Hudler*, 236 Va. at 390, 393, 374 S.E.2d at 40, 42. The *Hudler* Court never considered whether services provided to an existing tenant and attempted evictions were covered by § 36–88 because the Court was only asked to decide whether sales or rentals to prospective tenants were regulated under the Fair Housing Law. Certain language in the opinion, however, could be interpreted

---

**11.** Even if the court would analyze Bradley's retaliation claim as a pretext case, the court would draw the same conclusion from the evidence. The court would find that the plaintiff established her prima facie case, that the defendants offered a legitimate reason for their conduct, and that the plaintiff demonstrated that such a reason was mere pretext.

to exclude such services from § 36–88. But such an interpretation would be overbroad.

At issue in *Hudler* was whether the Virginia Mobile Home Lot Rental Act ("Mobile Home Act"), Va.Code Ann. §§ 55–248.41 to –248.52 (1986 & Supp.1989), preempted the Fair Housing Law's proscription against parenthood discrimination. In *Hudler*, a plaintiff sued a mobile home park which refused to rent space to his family for their mobile home, because they had a child. At the time, the Mobile Home Act did not forbid parenthood discrimination. The plaintiff sought to proceed under the Virginia Fair Housing Law which did regulate such discrimination, but the defendant argued that the Mobile Home Act, which was passed after the Fair Housing Law, preempted the Fair Housing Law. *Hudler*, 236 Va. at 390–91, 392, 374 S.E.2d at 40, 41.

The Virginia Supreme Court held that the two statutes were complementary. To harmonize the two statutes, the Court reasoned that

> [t]he Virginia Fair Housing Law forbids a wide variety of discriminatory practices which impede the sale or rental of "dwellings" to an *initial* prospective purchaser or tenant. The antidiscrimination provisions contained in the Mobile Home Lot Rental Act, on the other hand, address a different situation: an *existing* tenant in a mobile home park, who wishes to sell to a third person the mobile home he owns and occupies, may not be unreasonably impeded by the landlord upon whose land the mobile home is intended to remain. The Virginia Fair Housing Law did not cover the situation, and the Mobile Home Lot Rental Act, in 1975, remedied the omission.

*Id.*, 236 Va. at 393, 374 S.E.2d at 42 (emphasis in original).

*Hudler* does not bar the application of § 36–88 to all types of discrimination against existing tenants. *Hudler* only bars the application of § 36–88 to actual rentals and sales by existing tenants—the transactions in which dwellings are bought, sold, or leased. *Hudler* does not include facts concerning the provision of services during a leasehold or attempted evictions. In light of the facts in *Hudler* and the language in § 36–88, *Hudler* should be interpreted to permit the application of the Virginia Fair Housing Law to services provided to an existing tenant and attempted evictions during the leasehold period.[12]

The conclusions which this court reached with respect to Bradley's claims under 42 U.S.C. §§ 1981 and 1982 are applicable with regard to § 36–88 of the Virginia Fair Housing Law. The facts in this case demonstrate that the defendants, with the exception of Doss and Hall, violated § 36–88 when they attempted to evict Bradley in October, 1986.

## C. *Fairfax County Human Rights Ordinance.*

■ Bradley requests relief pursuant to § 11–1–3 of the Fairfax County Human Rights Ordinance ("1982 Ordinance" or "Ordinance"), Va.Code Ann. § 11–1–3 (1982).[13] The Commission found probable cause to believe that the defendants violated the Ordinance. Judge Ellis held that Bradley stated a valid claim under the Ordinance. *Bradley*, 707 F.Supp. at 224. Judge Ellis, however, did not discuss the validity of the Ordinance's provision for a private cause of action, in light of Dillon's Rule of strict construction. This court raises the issue *sua sponte* and holds that the Ordinance's provision for a private cause of

---

**12.** Judge Ellis also relied on *Commonwealth v. Lotz Realty Co.*, 237 Va. 1, 376 S.E.2d 54 (1989) to support his conclusion that the Virginia Fair Housing Law is applicable to Bradley's claims. *See Bradley*, 707 F.Supp. at 224 n. 17. In *Lotz*, the Virginia Supreme Court characteristically stated that "[w]e will assume, without deciding, that the Fair Housing Law is remedial in nature and should be liberally construed." *Lotz*, 237 Va. at 9, 376 S.E.2d at 58.

**13.** There is some dispute as to whether the 1982 or 1987 Ordinance applies in this case. Judge Ellis cited the 1982 Ordinance. *Bradley*, 707 F.Supp. at 218 n. 1. This court relies on the 1982 Ordinance because the actions at issue in this case occurred in 1986—prior to the enactment of the 1987 Ordinance.

action is valid under Dillon's Rule.[14] This court agrees with Judge Ellis that Bradley's claims are actionable under § 11-1-3.

Virginia adheres to Dillon's Rule of strict construction and its corollary which control the powers of local governing bodies. The Rule and its corollary provide that a local governing body's powers are fixed by statute and are limited to those powers which are expressly stated or necessarily implied. *E.g., County Board v. Brown*, 229 Va. 341, 344, 329 S.E.2d 468, 470 (1985). Dillon's Rule permits Fairfax County to enact only those ordinances authorized by the Virginia legislature.

The Ordinance, itself, provides for a private right of action.[15] The enabling legislation, however, does not expressly authorize the creation of a private right. The court must determine whether the legislation in effect at the time the Ordinance was enacted necessarily implies that a county may create a private cause of action to enforce its human rights ordinance.

**14.** The court may revisit Judge Ellis's pretrial ruling with regard to the Ordinance. The Fourth Circuit has stated that "whether rulings by one district judge become binding as 'law of the case' upon subsequent district judges is not a matter of rigid legal rule, but more a matter of proper judicial administration which can vary with some circumstances." *Hill v. BASF Wyandotte Corp.*, 696 F.2d 287, 290 n. 3 (4th Cir. 1982).

**15.** Section 11-1-14 of the Ordinance (§ 11-1-20 of the current Ordinance) stated that:

Any person who is aggrieved by any act prohibited herein may bring an appropriate action in a court of competent jurisdiction to seek damages, redress of injury, or injunctive relief arising out of any act prohibited herein as provided for by any applicable law. Nothing herein shall prevent any person from exercising any right or seeking any remedy to which he or she might otherwise be entitled, nor shall any person be required to pursue any remedy set forth herein as a condition of seeking relief from any court or other agency, except as is otherwise provided by applicable state or federal laws.

Fairfax County Human Rights Ordinance, Fairfax County, Va., Code § 11-1-14 (1982). The broad language which permits "any person" to bring an action "in a court of competent jurisdiction" indicates that the Ordinance provides a private right of action.

Section 15.1-776.1 of the Virginia Code is one source on which the County relied to enact the 1982 Ordinance. The section, as enacted in 1980, provided that

[t]he urban county executive board of supervisors may, by ordinance, establish a local commission on human rights which shall have the following duties:

1. To promote policies to ensure that all persons be afforded equal opportunity.

2. To serve as an agency for receiving, investigating and assisting in the voluntary resolution of complaints from citizens of the county regarding discriminatory practices and, with the approval of the board of supervisors, to seek, through appropriate enforcement authorities, prevention of or relief from such practices; provided, however, that the commission on human rights shall have no power to issue subpoenas or award damages.

Va.Code Ann. § 15.1-776.1 (1981).[16]

Section 15.1-776.1 does not, by express provision or necessary implication, grant or

**16.** The court relies on § 15.1-776.1 rather than on § 15.1-783.1 of the Virginia Code because the 1982 Ordinance applicable in this case was enacted when § 15.1-776.1 was in effect.

Section 15.1-776.1 was enacted in 1980 and was repealed by § 15.1-783.1 in 1986. The 1987 Ordinance was enacted when § 15.1-783.1 was in effect.

Section 15.1-783.1 expressly grants the County the authority to enact an Ordinance prohibiting various types of discrimination. Section 15.1-783.1 as amended in 1986 stated that

[t]he board of supervisors of an urban county executive form of government may enact an ordinance prohibiting discrimination in housing, employment, public accommodations, credit and education on the basis of race, color, religion, sex, national origin, age, marital status or disability. The board of supervisors may enact an ordinance establishing a local commission on human rights which shall have the following powers and duties:

1. To promote policies to ensure that all persons be afforded equal opportunity;

2. To serve as an agency for receiving, investigating, holding hearings, processing and assisting in the voluntary resolution of complaints regarding discriminatory practices occurring within the county; and

3. With the approval of the county attorney, to seek, through appropriate enforcement authorities, prevention of or relief from a violation of any ordinance prohibiting dis-

deny Fairfax County the authority to pass an ordinance which creates a private right of action. It does grant the County the power to establish a human rights commission with certain powers but does not discuss private actions. The court finds that the language in § 15.1–776.1 is inconclusive here, since it neither grants nor denies the County the power to create a private action.

Section 36–96 of the Virginia Fair Housing Law is a source from which the court may find implied power for the County to create a private cause of action. Section 36–96 permits counties to "enact ordinances in accordance with the provisions of this chapter." Va.Code Ann. § 36–96 (1984). One of the "provisions of this chapter" is § 36–87(a) of the Virginia Fair Housing Law. Section 36–87(a), as it appeared in 1982, provided that it was the Commonwealth's policy to prohibit discriminatory housing practices. Va.Code Ann. § 36–87(a) (1984). The County's provision for a private cause of action to redress discrimination is "in accordance with" the policies set forth in § 36–87(a).

Another provision relevant to § 36–96 is § 36–94(b) of the Virginia Fair Housing Law which in 1982 provided, in part, that

> [a]ny person adversely affected by the use of a discriminatory practice prohibited under this chapter may institute an action for injunctive relief and money damages against the person responsible for such discriminatory practice in the circuit court of the county or city in which such practice was employed.

Va.Code Ann. § 36–94(b) (1984). The County's enactment of a private right of action similar to the provision in § 36–94(b) is "in accordance with the provisions" of the Virginia Fair Housing Law. The authority for such a measure is necessarily implied in § 36–96.

The general police power of counties set forth in § 15.1–510 of the Virginia Code is another source of authority from which to create a private right of action. Section 15.1–510 states, in part, that "[a]ny county may adopt such measures as it may deem expedient to secure and promote the health, safety and general welfare of the inhabitants of such county, not inconsistent with the general laws of this Commonwealth." Va.Code Ann. § 15.1–510 (1989). Provision for a private cause of action to redress discrimination certainly promotes the "general welfare" of Fairfax County residents. The language in § 36–87(a) of the Virginia Fair Housing Law supports such a conclusion. Section 36–87(a) indicates that the Fair Housing law which bars housing discrimination is an exercise of police power. Va.Code Ann. § 36–87 (1984). It follows that Fairfax County's creation of a private cause of action for discrimination is also an exercise of police power.

The defendants stress that reliance on implied authority in certain sections of the Virginia Code for a private cause of action is misplaced, given that other sections of the Virginia Code expressly grant and deny authority for private actions. As the Virginia Supreme Court explained, however, the "maxim that the mention of one thing implies the exclusion of another is an aid to statutory construction, not a rule of law." *Gordon v. Board of Supervisors,* 207 Va. 827, 833, 153 S.E.2d 270, 275 (1967). To determine whether a power is necessarily implied in a statute, a court "must look to the purposes and objects of the Act in question." *Id.*

In this case in particular, the express grant or denial of a private cause of action in one section of the Virginia Code does not necessarily imply a grant or denial of the

crimination and to exercise such other powers and duties as provided for in this article; however, the commission shall have no power itself to issue subpoenas, award damages or grant injunctive relief.
Va.Code Ann. § 15.1–783.1 (Supp.1988).
　Section 15.1–783.1 does not control here because it was not in effect when Fairfax County enacted the 1982 Ordinance. Consequently, the

court does not rely on § 15.1–783.1 to determine whether the board had the power to create a private cause of action. *Cf. Gordon v. Board of Supervisors,* 207 Va. 827, 831, 153 S.E.2d 270, 274 (1967) (statute adopted after ordinance enacted not designed to validate acts of Board when Board does not possess pre-existing power).

ability to create a private cause of action in another section of the Code. The defendants argue that because § 36–94(b) of the Virginia Fair Housing Law expressly creates a private cause of action, the other sections of the Virginia Code which do not include such an express provision should be read to prohibit a private action. Section 2.1–725 of the Virginia Human Rights Act, Va.Code Ann. § 2.1–725 (1987), may be construed to yield an opposite conclusion. Section 2.1–725 expressly declines to create an additional private cause of action to enforce the Virginia Human Rights Act. Section 2.1–725 may demonstrate that the lack of an express denial of a private action in other Code sections implies a grant of power. In view of such ambiguities, the court must look beyond the language in these Code sections, to legislative purpose.

The Virginia legislature enacted various Code provisions in an effort to encourage Fairfax County to redress discriminatory practices. A private cause of action is valid in this case simply because it is a necessary enforcement tool. The Ordinance may have little practical force in the absence of the ability to bring a private action. Provision for County enforcement, alone, may be ineffective, given the limited County resources. Fairfax County determined that a private cause of action is a necessary means of enforcement, and this court will not disturb such a decision.

The court concludes that the Ordinance is valid under Dillon's Rule. The court also holds that the conclusions which this court reached with respect to Bradley's other claims are applicable with regard to the Ordinance. The facts in this case demonstrate that the defendants, with the exception of Doss and Hall, violated the Ordinance when they attempted to evict Bradley in October, 1986.[17]

---

**17.** Bradley's relief in this case is not altered by this court's conclusions with regard to the validity of the Ordinance and the application of the Virginia Fair Housing Law because she is entitled to relief based on her claims under 42 U.S.C. §§ 1981 and 1982.

**18.** The court will not rule, at this time, on the appropriateness of equitable relief.

### D. *Relief.*

Under §§ 1981 and 1982 Bradley is entitled to both legal and equitable relief[18], including compensatory and punitive damages when appropriate.[19] *Johnson v. Railway Express Agency,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975); *see Sullivan,* 396 U.S. at 238–40, 90 S.Ct. at 405–06 (court states equitable relief and compensatory damages available under § 1982); *Bills v. Hodges,* 628 F.2d 844, 846 (4th Cir.1980) (court does not state what relief available under § 1982, but does state district court's findings with regard to compensatory and punitive damages not clearly erroneous); *Headley v. Bacon,* 828 F.2d 1272, 1278 (8th Cir.1987) (court states compensatory and punitive damages available under § 1982). If the defendant exhibits malice, evil motive, or callous indifference to a federally protected right, a court may award punitive damages. *Stephens v. South Atlantic Canners, Inc.,* 848 F.2d 484, 489 (4th Cir.) (citing *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983)), *cert. denied,* — U.S. —, 109 S.Ct. 564, 102 L.Ed.2d 589 (1988).

The court finds that an award of $9,000.00 in compensatory damages will adequately compensate Bradley. Gill's conduct deeply wounded Bradley. Bradley is a quiet person who tends to stick to herself. She can be insensitive at times, as evidenced by her loud music. But the invectives injured her feelings. Bradley testified about the effect of being called a "nigger" by Gill. She became teary eyed on the stand while she recounted the incidents in this case, even three years after the events occurred. Bradley was humiliated and embarrassed by the incidents. She had trouble sleeping: She was restless, woke up in the middle of the morning, and

---

**19.** Because such relief is available under §§ 1981 and 1982, the court will not discuss whether such relief is also available under the Virginia Fair Housing Law and the Fairfax County Human Rights Ordinance.

could not go back to sleep. Her job performance as an accounting assistant was interrupted. (Trans.Vol. I, Bradley at 60–61).

The October, 1986 eviction attempt was an independent source of injury to Bradley. Bradley is entitled to be compensated for the defendants' attempts to chill her right to seek redress for her grievances through administrative means. She undoubtedly experienced further distress when she was again faced with the possibility of eviction. The second eviction notice also served to revive all of the problems she experienced prior to Gill's eviction. Although Gill had left Holly Court, Bradley continued to relive the humiliation and embarrassment of the prior months.

Bradley's injuries are compensable, but her damages must be limited. Bradley continues to live in the Holly Court Apartments. She never sought counseling or the advice of a medical professional and she lost no time from work. The court does not feel that an award of punitive damages would be appropriate under the circumstances of this case. There is no evidence that the defendants exhibited malice, evil motive, or callous indifference to Bradley's rights. The evidence does support an award of $9,000.00 in compensatory damages for which all of the defendants, except Doss and Hall, are liable.

An appropriate Order shall issue.

### ORDER

In accordance with the accompanying Memorandum Opinion, it is ORDERED that:

(1) Judgment be, and hereby is, ENTERED in favor of the plaintiff, Felisha A. Bradley, and against the defendants, Carydale Enterprises, The 7250 Partnership, Holly Court Operating Partnership, Carydale Apartments, Inc., Dale Weed, and Paul C. Kincheloe, Jr. in the amount of $9,000.00 plus costs and interest.

(2) Judgment be, and hereby is, ENTERED in favor of the defendants, Betty Doss and Ann Hall, and against the plaintiff, Felisha A. Bradley.

(3) The plaintiff shall file her petition for remedies within fifteen days of the date on which this Order is entered. The defendants shall file their response within thirty days of the date on which this Order is entered.